UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMES KELLMER<br>409 S. Cranford Rd.<br>Cherry Hill, N.J.,<br><br>Derivatively on Behalf of<br>FANNIE MAE, a/k/a Federal National<br>Mortgage Association,<br><br>Plaintiff,<br><br>v.<br><br>FRANKLIN D. RAINES, J. TIMOTHY HOWARD,<br>LEANNE SPENCER, DANIEL H. MUDD, JAMES<br>A. JOHNSON, LAWRENCE M. SMALL, JAMIE<br>GORELICK, ROBERT J. LEVIN,<br>STEPHEN B. ASHLEY, THOMAS P. GERRITY,<br>KENNETH M. DUBERSTEIN, ANN KOROLOGOS,<br>FREDERIC V. MALEK, DONALD B. MARRON,<br>ANNE M. MULCAHY, JOE K. PICKETT,<br>LESLIE RAHL, H. PATRICK SWYGERT,<br>JOHN K. WULFF, VICTOR H. ASHE, MOLLY H.<br>BORDONARO, WILLIAM R. HARVEY, TAYLOR<br>C. SEGUE, III, MANUEL JUSTIZ, VINCENT  A.<br>MAI, ROGER E. BIRK, STEPHEN FRIEDMAN,<br>GARRY MAURO, MAYNARD JACKSON,<br>ESTEBAN E. TORRES, KPMG LLP and<br>GOLDMAN SACHS GROUP, INC. ,<br><br>Defendants,<br><br>and<br><br>FANNIE MAE a/k/a Federal National Mortgage<br>Association,<br><br>Nominal Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

## THE NATURE OF THE CASE

1.  Plaintiff, James Kellmer, a shareholder of Fannie Mae ("Fannie Mae" or "the Company"), brings this derivative action on behalf of the Company against current and former officers and/or directors and certain third parties to remedy defendants' breaches of fiduciary duty and other illegal accounting manipulations occurring from approximately 1998 through 2004 that resulted in an estimated $10.6 billion of losses to the Company, well over $1 billion in expenditures by the Company to recreate and correct historical financial documents, massive expenses for legal and expert fees and substantial losses of goodwill. In addition, as a result of defendants' wrongful conduct, Fannie Mae has paid a $400 million civil monetary penalty to the Office of Federal Housing Enterprise Oversight ("OFHEO") and the Securities and Exchange Commission ("SEC") and agreed to implement costly remedial measures. Defendants' illegal actions have also caused the Company to be named as a defendant in securities class action litigation and ERISA class actions, as well as in other, individual cases as a direct result of the wrongdoing described herein, all of which has exposed Fannie Mae to additional billions of dollars in damages. Finally, this scandal has caused the Company's stock price to plummet, causing Fannie Mae to lose over $31 billion in valuable market capitalization and weakened its credit ratings.

2.  At bottom, defendants' illegal financial manipulations were animated by unbounded greed – artificially inflating the annual bonuses and other compensation of senior executives that was linked to the Company's earnings per share ("EPS"). Senior management manipulated accounting to falsely reach EPS targets so as to reap staggering, undeserved bonuses. For example, over $52 million of defendant Raines'

compensation of $90 million during this period was directly the result of "achieving"

EPS targets (while his actual salary for the period totaled $6.5 million).

3. Defendants' wrongful conduct arose in part from an arrogance borne of the

special status and privileges of a privately owned and managed, yet federally chartered,

corporation. As defendant Mudd observed, "We used to, by virtue of our peculiarity, be

able to write, or have written, rules that worked for us." Rules that "worked" for

defendants, as opposed to the Company, allowed them to "cook the books" -- to

manipulate earnings figures and ignore generally accepted accounting principles

("GAAP") – in order to astronomically increase executive bonuses. Those ill-gotten

millions are particularly offensive because they stand in stark contrast to the fundamental

purpose of Fannie Mae – to facilitate the financing of affordable housing for low- and

middle- income families.

4. In sum, as OFHEO reported in May 2006:

- Fannie Mae senior management promoted an image of the [Company]
  as one of the lowest-risk financial institutions in the world and as "best
  in class" in terms of risk management, financial reporting, internal
  control, and corporate governance. The findings in this report show that
  risks at Fannie Mae were greatly understated and that the image was
  false.

- During the period … 1998 to mid-2004 … Fannie Mae reported
  extremely smooth profit growth and hit announced targets for earnings
  per share precisely each quarter. Those achievements were illusions
  deliberately and systematically created by the [Company's] senior
  management with the aid of inappropriate accounting and improper
  earnings management.

- A large number of Fannie Mae's accounting policies and practices did
  not comply with Generally Accepted Accounting Principles (GAAP).
  The [Company] also had serious problems of internal control, financial
  reporting, and corporate governance. Those errors resulted in Fannie
  Mae overstating reported income and capital by a currently estimated

$10.6 billion.

- By deliberately and intentionally manipulating accounting to hit earnings targets, senior management maximized the bonuses and other executive compensation they received, at the expense of shareholders....

- Fannie Mae's Board of Directors contributed to those problems by failing to be sufficiently informed and to act independently of its chairman, Franklin Raines, and other senior executives; by failing to exercise the requisite oversight over the [Company's] operations; and by failing to discover or ensure the correction of a wide variety of unsafe and unsound practices.

- The Board's failures continued in the wake of revelations of accounting problems and improper earnings management at Freddie Mac and other high profile firms, the initiation of OFHEO's special examination, and credible allegations of improper earnings management made by an employee of the [Company's] Office of the Controller.

- Fannie Mae senior management sought to interfere with OFHEO's special examination by directing the [Company's] lobbyists to use their ties to 1) generate a Congressional request for the Inspector General of the Department of Housing and Urban Development (HUD) to investigate OFHEO's conduct of the examination and 2) insert into an appropriations bill language that would reduce the agency's appropriations until the Director of OFHEO was replaced.

5. By letter dated September 24, 2004, in compliance with Rule 23.1 of the Federal Rules of Civil Procedure, plaintiff, through his counsel, made a demand on the Fannie Mae Board of Directors ("the Board") to institute this action. The Board has not taken any of the actions demanded by plaintiff in that letter. Indeed, to date, the Board has not even replied.

6. Accordingly, plaintiff's demands were effectively rejected by the Board. As a result, plaintiff initially commenced suit against many of the defendants named herein on January 10, 2005. In his Complaint, plaintiff alleged, as he has in this Complaint, that he had made a demand upon Fannie Mae's Board to institute this action, which was effectively rejected by the lack of action or response by the Board.

7.  On February 14, 2005 the Court entered an Order consolidating plaintiff Kellmer's initial case with six other derivative cases, appointing the plaintiffs in two of those cases as Lead Plaintiffs and appointing their counsel as Lead Counsel.  None of the other derivative plaintiffs, including Lead Plaintiffs, had made a demand upon Fannie Mae's Board, as plaintiff Kellmer had done.  Subsequently, Lead Plaintiffs filed a consolidated derivative complaint, later superseded by an amended consolidated complaint.  Although styled a consolidated complaint, the amended complaint did not name plaintiff as one of the plaintiffs therein, advance plaintiff Kellmer's claims or rely upon his demand upon Fannie Mae's Board.  Instead, it alleged that demand was futile.

8.  Defendants moved to dismiss the amended consolidated derivative complaint on the grounds, *inter alia*, that Lead Plaintiffs had not made a demand on Fannie Mae's Board and that demand was not futile.  On May 31, 2007, the Court issued a Memorandum Opinion and Order dismissing the amended consolidated derivative complaint on the sole ground that demand was not futile.  The Court did not address plaintiff Kellmer's claims, nor his demand.  Likewise, the Court did not purport to dismiss plaintiff Kellmer's case, nor as a matter of law could it.

9.  The Clerk's Office, however, has marked the electronic docket in this case (1:05-cv-0037) as "CLOSED."  For that reason, among others, plaintiff Kellmer is hereby recommencing suit by this Complaint.  The claims asserted herein nevertheless relate back in all respects to the original filing on January 10, 2005.

### JURISDICTION AND VENUE

10.  This Court has jurisdiction over the subject matter of this action pursuant to 12 U.S.C. § 1723a.

11. This action was not brought collusively to confer jurisdiction on a court of the United States that it would not otherwise have.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, among other things, many of the acts alleged and complained of herein occurred in this District.

13. Plaintiff brings this action derivatively on behalf of nominal defendant Fannie Mae. No claims are asserted against Fannie Mae. Plaintiff will adequately and fairly represent the interests of Fannie Mae and its shareholders in enforcing and prosecuting their rights.

## THE PARTIES

### A. PLAINTIFF

14. Plaintiff James Kellmer is a New Jersey domiciliary who owns and has owned common stock of Fannie Mae at all times relevant hereto.

### B. NOMINAL DEFENDANT

15. Nominal defendant Fannie Mae is a federally chartered corporation originally established in 1938. The Company became a stockholder-owned and privately managed corporation in 1968. Fannie Mae is in the business of purchasing mortgages from banks and mortgage lenders in the secondary mortgage market and thereby providing additional liquidity for those banks and lenders. Its principal place of business is located at 3900 Wisconsin Avenue, N.W., Washington, D.C.

### C. OFFICER DEFENDANTS

16. Defendant Franklin D. Raines served as Chairman of Fannie Mae and its Chief Executive Officer ("CEO") from January 1999 until his resignation on December 21, 2004.

17. Defendant J. Timothy Howard was employed by Fannie Mae from 1982 until his resignation in December 2004. He served as Chief Financial Officer of Fannie Mae from 1990 until his resignation and as Executive Vice President from 1990 to May 2003. He was a director from 2003 until his resignation, and served as Vice Chairman from May 2003 until his resignation.

18. Defendant Leanne Spencer served as Senior Vice President and Controller of Fannie Mae from 1999 until she "stepped down" from those positions on January 17, 2005. She continued in a non-officer capacity as a Special Advisor for a period thereafter.

19. Defendant Daniel H. Mudd served as Chief Operating Officer of Fannie Mae and Vice Chairman of its Board beginning in February 2000. Upon defendant Raines' resignation on December 21, 2004, he assumed the position of interim CEO and Executive Vice President and served in those capacities until June 2005, when he was appointed CEO and President of the Company.

20. Defendant Lawrence M. Small served as President and Chief Operating Officer of Fannie Mae, and as a member of its Board, from 1991 to 2000.

21. Defendant Robert J. Levin has served as Executive Vice President of Fannie Mae in various capacities since 1998.

22. Defendant James A. Johnson served as Chairman of the Board and Chief Executive Officer of Fannie Mae from 1991 to 1998.

### D. DIRECTOR DEFENDANTS

23. Defendant Jamie Gorelick served as a member of the Board of Fannie Mae from 1997 to 2003. From 1998 to 2003, she was Vice Chairman of the Board.

24. Defendant Stephen B. Ashley has served as a member of the Board of Fannie Mae since 1995. He assumed the position of Chairman of the Board in 2004 after the resignation of defendant Raines.

25. Defendant Thomas P. Gerrity has served as a member of the Board of Fannie Mae since 1991.

26. Defendant Kenneth M. Duberstein has served as a member of the Board of Fannie Mae since 1998.

27. Defendant Ann Korologos served as a member of the Board of Fannie Mae from 1994 until her resignation on July 31, 2006.

28. Defendant Frederic V. Malek served as a member of the Board of Fannie Mae from 2002 until his resignation at the end of 2005.

29. Defendant Donald B. Marron served as a member of the Board of Fannie Mae from 1994 until his resignation on July 31, 2006.

30. Defendant Anne. M. Mulcahy served as a member of the Board of Fannie Mae from 2000 until her resignation on October 19, 2004.

31. Defendant Joe K. Pickett has served as a member of the Board of Fannie Mae since 1996.

32. Defendant Leslie Rahl has served as a member of the Board of Fannie Mae since 2004.

33. Defendant H. Patrick Swygert has served as a member of the Board of Fannie Mae since 2000.

34. Defendant John K. Wulff has served as a member of the Board of Fannie Mae since 2004.

35. Defendant Victor H. Ashe served as a member of the Board of Fannie Mae from 2001 to 2004.

36. Defendant William R. Harvey served as a member of the Board of Fannie Mae from 2001 to 2004.

37. Defendant Taylor C. Segue, III served as a member of the Board of Fannie Mae from 2001 to 2004.

38. Defendant Manuel Justiz served as a member of the Board of Fannie Mae from 2001 to 2004.

39. Defendant Vincent A. Mai served as a member of the Board of Fannie Mae from 1991 to 2002.

40. Defendant Roger E. Birk served as a member of the Board of Fannie Mae from 1985 to 2001.

41. Defendant Stephen Friedman served as a member of the Board of Fannie Mae from 1996 to 2002..

42. Defendant Garry Mauro served as a member of the Board of Fannie Mae from 1999 to 2001.

43. Defendant Maynard Jackson served as a member of the Board of Fannie Mae from 2000 to 2001.

44. Defendant Esteban E. Torres served as a member of the Board of Fannie Mae from 2000 to 2001.

### E. THIRD-PARTY DEFENDANTS

45. Defendant KPMG LLP("KPMG") is an international certified public accounting firm that served as Fannie Mae's purportedly independent auditor from 1969 until December 21, 2004.

46. Defendant Goldman Sachs Group, Inc. ("Goldman Sachs") is an integrated financial institution that provided investment banking, underwriting, and advisory services to Fannie Mae and participated directly in certain of the wrongdoing alleged herein.

### GENERAL ALLEGATIONS

### A. THE OPERATIONS OF FANNIE MAE

47. Fannie Mae is the nation's largest source of financing for home mortgages. While chartered by the federal government, and having certain privileges as a result – such as an exemption from state and local income taxes – Fannie Mae is a private, shareholder-owned company and its common stock is publicly traded on the New York Stock Exchange. Fannie Mae does not loan money directly to consumers. Rather, the Company buys mortgages from banks, thereby by freeing up the banks' limited capital, which in turn allows them to make more loans. The goal of these operations is to encourage home-ownership, especially by low- and middle- income families.

48. Fannie Mae's profit-making operations are based on two components. In its credit guarantee business, the Company gets a fee for guaranteeing the payments on the mortgages it buys, which it then re-sells to investors, usually in the form of mortgage-backed securities (that is, beneficial interests in pools of mortgage loans or other mortgage-related securities issued by Fannie Mae).

49. In its portfolio investment business, Fannie Mae holds the mortgages and mortgage-related securities and other investments that it purchases from banks, other lenders, securities dealers, and other investors. The Company also purchases short-term, non-mortgage assets for liquidity and investment purposes. Fannie Mae funds these portfolio purchases by issuing short and long term debt, and by selling debt securities to domestic and international investors. Fannie Mae profits to the extent that the yield on the mortgage assets and other investments in its portfolio exceeds the cost of the debt securities it issued to fund those portfolio investments.

50. Fannie Mae's business is subject to several risks common to financial institutions. Most mortgage borrowers in the United States can prepay their mortgage at any time without any penalty. Thus, when interest rates decline, borrowers refinance their mortgages at lower rates, causing their original mortgages to have a shorter life than the lender projected. Consequently, when interest rates drop, the investment yield on Fannie Mae's mortgage-related investments is reduced. When this occurs, Fannie Mae receives cash as the older, higher-rate mortgages are paid off, but faces the risk that it will not be able to reinvest this cash at rates that are above the rates it is required to pay on its outstanding debt securities. This risk is called "prepayment risk."

51. Another risk is linked to the short-term and long-term debt Fannie Mae issues to fund its mortgage purchases. When interest rates decline, Fannie Mae's cost of issuing new short-term debt also declines, but it is required to pay the original and higher interest rate on its longer-term debt until that previously issued debt matures or can be called. This risk is called "interest rate risk."

11

52. Consequently, interest rate fluctuations and prepayment risks expose Fannie Mae to radical earnings volatility from quarter to quarter. To offset or hedge against these risks, Fannie Mae typically engages in a variety of derivative transactions and related hedges. As the name implies, a derivative is an asset whose value derives from that of some other asset. In effect, a derivative transaction is a side bet on interest rates, exchange rates, commodity prices, and so on. Derivative transactions used by Fannie Mae include issuing callable debt, interest rate swaps, options to enter into interest rate swaps ("swaptions"), interest rate caps and floors, foreign currency swaps, and forward starting swaps. The SEC's Chief Accountant has called Fannie Mae "one of the largest users of derivatives in the world."

### B. DUTIES OF THE DEFENDANTS

53. The officers and directors of Fannie Mae have and at all times relevant hereto had a duty to:

(a) manage, conduct, supervise, and direct the business affairs of Fannie Mae in accordance with all applicable law, government rules and regulations, and the charter and bylaws of Fannie Mae;

(b) neither engage in self-dealing nor permit any officer, director, or employee of Fannie Mae to engage in self-dealing;

(c) neither violate nor knowingly permit any officer, director, or employee of Fannie Mae to violate applicable laws and regulations;

(d) remain informed as to the status of Fannie Mae's operations, including its expenses in relation to prepayment of mortgages and its accounting for derivative contracts;

(e) upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the law and their duty of candor to Fannie Mae's shareholders;

(f) prudently protect the Company's assets;

(g) maintain and implement an adequate, functioning system of internal legal, financial, and accounting controls, such that the Company's financial statements – including its expenses, accounting for derivative contracts, and other financial information – would be accurate and the actions of Fannie Mae's directors would be in accordance with all applicable laws; and

(h) supervise the preparation and filing of any financial reports or other information required by law from Fannie Mae and to examine and evaluate any reports of examinations, audits or other information concerning the financial affairs of Fannie Mae, and to make full and accurate disclosure of all material facts concerning them.

54. Defendant KPMG, as Fannie Mae's purportedly independent auditor, had a duty, among others, to audit Fannie Mae's financial statements in accordance with Generally Accepted Auditing Standards ("GAAS").

## C. WRONGFUL CONDUCT OF OFFICERS AND DIRECTORS

55. Under the executive compensation program at Fannie Mae, senior management reaped financial rewards when the Company met EPS growth targets established, measured, and set by senior management itself. Beyond the basic package of salary and benefits, three significant components of compensation depended directly on reaching EPS targets: 1) the Annual Incentive Plan ("AIP"), under which by 2003 more than 700

employees were eligible for bonuses; 2) the Performance Share Plan, which granted stock
to the 40-50 senior executives based on 3-year performance cycles; and 3) the EPS
Challenge Grant, a company-wide program championed by defendant Raines that tied the
award of a substantial amount of stock options to the doubling of core business EPS from
1998 to 2003.

56. The AIP bonus pool grew from $8.5 million in 1993 to $65.1 million in 2003.
Bonuses for executives often totaled more than their annual salary. For senior
executives, EPS-driven compensation dwarfed basic salary and benefits.

57. This compensation structure at Fannie Mae greatly increased the incentive for
senior executives to manipulate both the Company's EPS and its EPS targets. Indeed,
Fannie Mae senior management achieved the Company's earnings targets by regularly
manipulating accounts and accounting rules, calibrating repurchases of shares and debt to
achieve EPS targets, entering into questionable transactions, and misallocating resources.
Management routinely shifted earnings to future years when the EPS target for the
maximum bonus payout for the current year appeared likely.

58. The Board and its committees utterly failed to meet their obligations to ensure the
safety and soundness of the Company's management and operation. The Board failed to
stay appropriately informed of corporate strategy, to assure appropriate delegations of
authority, to ensure that Board committees functioned effectively, to provide an
appropriate check on defendant Raines and other top officers of the Company, and to
exercise independence and vigilance in supervising management on behalf of the
Company and its shareholders.

59. As a result of these actions, defendants either breached or aided and abetted the breach of the fiduciary obligations of Fannie Mae's officers and directors to the Company and its shareholders.

### 1. IMPROPER DEFERRAL OF INCOME AND EXPENSES TO SUBSEQUENT PERIODS

60. As noted above, the volatility of interest rates has an immediate, and often significant, effect on Fannie Mae's income. The governing principles of GAAP reflect this economic reality. Under Financial Accounting Standards Board Statement of Financial Accounting Standard ("FAS") 91, Fannie Mae must recognize adjustments to its income by estimating the effective yield of it mortgages and mortgage securities every time it reports results to investors. In doing so, Fannie Mae must consider how fast homeowners might prepay their mortgages, adjust the effective yields on its securities, and make a new estimate about future repayments. This revision in expected yields must be booked immediately as an adjustment to interest income.

61. The senior management of Fannie Mae regularly violated FAS 91 to hit EPS targets. For example, in 1998, internal projections of financial results showed that the Company would have unanticipated amortization costs of $440 million, a number which should have adjusted Fannie Mae's income downwards under FAS 91. However, complying with FAS 91 would have caused the Company's EPS to fall below the minimum bonus target range, resulting in no bonuses for Fannie Mae's senior executives.

62. Rather than complying with GAAP by reducing the Company's income by $440 million, management adjusted it by only $240 million, "deferring" the remaining $200 million in expenses to subsequent years. This amount became known as the "catch-up."

15

63. Moreover, the reserve established by this deferral, commonly called a "cookie jar" reserve, itself violated GAAP (FAS 5), which prohibits the establishment of a reserve for general or unspecified business risks.

64. Defendant KPMG initially disagreed with the Company's refusal to fully book the $440 million shortfall, but ultimately, due to its lack of independence, the fact that Fannie Mae was one of its most significant clients and otherwise, acquiesced to the individual officer defendants' manipulation and termed this deferral an "audit difference."

### 2. IMPROPER USE OF HEDGE ACCOUNTING ON DERIVATIVE CONTRACTS

65. During the period at issue, Fannie Mae was one of the world's largest users of derivatives, which are intended to act as a hedge against the volatility of the financial markets. Under GAAP (FAS 133), all derivatives are to be recorded as either assets or liabilities on a company's balance sheets at their fair value, unless they qualify for "hedge accounting." Hedge accounting provides a means for matching the earnings effect of a derivative and the related designated hedge transaction, thereby mitigating the volatility of earnings on a company's books when a company is successfully hedging. However, under GAAP, if a company's hedges are ineffective in offsetting the specific risk being hedged, that result must be recorded. If there is a low correlation between the changes in value of a derivative and the changes in value of the hedged item, an increased volatility in earnings will be – or should be – apparent on a company's books.

66. For a company with a huge and dynamic hedging program like Fannie Mae, hedge accounting poses major operational challenges to ensure the continuing effectiveness of its hedging instruments. As OFHEO concluded, "By inappropriately assuming that the vast majority of its derivatives were 'perfectly effective' hedges, the

hedging system adopted by Fannie Mae management achieved the volatility-dampening benefits of hedge accounting without the need to address the associated operational challenges." As a result, "Fannie Mae's improper implementation of FAS 133 masked billions of dollars of earnings volatility."

67. In its SEC filing at the close of 2005, Fannie Mae identified its improper application of hedge accounting as one of the two most significant reasons for its need to lower its reported earnings through 2004 by $10.6 billion.

### 3. MISCELLANEOUS MANIPULATIONS

68. Fannie Mae's management employed a variety of clever and corrupt schemes to manipulate the appearance of the Company's financial performance so as to secure the extraordinary bonuses to which they were in fact not entitled. As OFHEO has now reported, the Company's management:

- deliberately developed and adopted accounting policies to spread estimated income or expense that exceeded predetermined thresholds over multiple periods;

- established a materiality threshold for estimated income and expense, within which management could avoid making adjustments that would otherwise be required under GAAP;

- made discretionary adjustments to the financial statement for the sole purpose of minimizing volatility and achieving desired financial results;

- forecasted and managed future unrecognized income associated with misapplied GAAP;

- capitalized reconciliation differences as 'phantom' assets or liabilities and amortized them at the same speeds as 30-year fixed-rate mortgages;

- developed estimation methods that were inconsistently applied to retrospective and prospective amortization required by GAAP for current and future periods;

- developed and implemented processes to generate multiple estimates of amortization and varying assumptions in order to select estimates that provided optimal accounting results;

- failed to properly investigate the concerns of an employee regarding illogical and anomalous amortization results, along with a further allegation by that employee of an intent to misstate reported income; and

- tolerated significant weaknesses in internal controls surrounding the amortization process.

#### 4. OTHER MISCONDUCT

69. It was only in late 2003, when the Federal Home Loan Mortgage Corporation ("Freddie Mac") was forced to restate its earnings following the replacement of its independent auditors, that regulators woke up to the wrongdoing at Fannie Mae. OFHEO, and subsequently the SEC, conducted investigations that confirmed the wrongful conduct set out above.

70. On December 21, 2004, in the face of severe criticism from OFHEO (which had, itself, been grossly negligent in its oversight of Fannie Mae and Freddie Mac) and the SEC, the director defendants compounded the breach of their duties to Fannie Mae by refusing to fire defendants Raines and Howard for cause and demanding disgorgement of their ill-gotten millions. Instead, the Board accepted the resignations of these defendants.

71. As a result, defendants Raines and Howard became entitled to collect tens of millions of dollars in severance benefits under the new no-fault termination provisions in their employment contracts (added in 2004 after OFHEO had finally begun to investigate) and to keep millions of dollars in previously received bonuses and stock sales that the Company was entitled to rescind under Sarbanes-Oxley.

#### D. WRONGFUL CONDUCT OF THIRD PARTIES

72. From 1969 through the end of 2004, defendant KPMG served as Fannie Mae's purportedly independent auditor and purported to audit the Company's financial statements in accordance with GAAS. Fannie Mae was one of KPMG's largest clients. During the years 1998 through 2003, KPMG was paid over $53 million for its work for Fannie Mae, nearly $44 million of which was charged for tasks such as the development, review, and approval of accounting policies for Fannie Mae and the development and assistance with processes related to the implementation of required GAAP hedge and derivative accounting rules.

73. KPMG knew or recklessly disregarded the fact that Fannie Mae's financial statements were not prepared, and so not formally presented, in accordance with GAAP; that KPMG's audits were not conducted in accordance with GAAS; that Fannie Mae's accounting policies and its application of those policies did not comply with GAAP; and that Fannie Mae used accounting policies in the preparation of publicly issued financial statements which did not comply with GAAP.

74. Despite and possibly due to its lack of independence, KPMG and its partners knowingly and substantially participated in the issuance and dissemination of its false and misleading audit opinions as to Fannie Mae's financial statements.

75. Defendant Goldman Sachs intentionally designed and implemented sham transactions with no legitimate business purpose in order to create losses for Fannie Mae and create the false appearance that Fannie Mae's earnings were stable and not volatile.

76. Specifically, in the fourth quarter of 2001, and first quarter of 2002, Goldman Sachs devised and executed a series of Fannie Mae $20 billion and $10 billion Real Estate Mortgage Investment Conduit ("REMIC") transactions (Fannie Mae REMIC

19

Trusts 2001-81 and 2002-21).  Goldman Sachs was the underwriter/dealer for both REMIC Trusts.  These REMIC transactions had no legitimate economic or business purpose.  Their sole purpose was to shift $10 million of Fannie Mae's earnings into future years.

77.  Entering into transactions that have no economic purpose other than shifting income is a violation of GAAP.  In addition, the transactions were not accounted for properly, in part because of internal control deficiencies at Fannie Mae, including Fannie Mae's lack of systems to account for the transactions properly.

78.  Neither Fannie Mae's management nor Goldman Sachs made truthful, complete, or appropriate disclosures in the associated prospectus supplements, Fannie Mae financial statements, or other public statements about the transactions.  To the contrary, Fannie Mae's management and Goldman Sachs conspired to create a joint strategy of false and deceptive public statements, actively trying to conceal the purpose and true nature of these transactions.

### E. THE NECESSITY OF THIS DERIVATIVE ACTION

79.  On September 24, 2004, as required by Rule 23.1 of the Federal Rules of Civil Procedure, plaintiff, through his legal counsel, made a written demand on the Fannie Mae Board to institute this action.  The Board neither responded to that demand nor took the actions demanded.  As such, those demands are deemed rejected.

80.  Another demand was subsequently made by another shareholder.  In response, the Board voted improperly to appoint a sham "Special Review Committee" consisting of three director-defendants – defendants Marron, Korologos, and Ashley, three of the directors responsible for the wrongdoing alleged herein – purportedly to "investigate"

20

such claims of wrongdoing, including the claims against themselves. Under Fannie Mae's Charter, Section 308(b), given the directors' self-interest in protecting themselves, these directors should have been barred from any such role and their appointment evidenced the Board's refusal to deal with Fannie Mae's claims fairly, objectively and in its sole interest.

81. In the 2 1/2 years since the initial written demand was made on behalf of plaintiff upon Fannie Mae's Board, this Special Review Committee has taken no effective action to recover the Company's existing and future damages from the wrongdoers. Although Fannie Mae has commenced suit itself against defendant KPMG, because many of its senior officers conspired with and were *in pari delicto* with KPMG and themselves responsible for the wrongdoing alleged herein, the Company is not in a position to pursue claims against KPMG objectively and free of disabling conflicts of interest.

82. Indeed, far from acting in the interest of the Company, each of the members of the "Special Review Committee" permitted a further waste of Fannie Mae's assets when they voted to permit defendants Raines and Howard to resign their positions rather than being fired for cause and misconduct, thereby costing the Company $19 million in future payments to defendant Raines alone. Moreover, these very same director defendants have recently caused or otherwise participated in the decision of the Board which caused Fannie Mae to petition OFHEO to allow Fannie Mae to release millions of dollars of incentive payments, much of which would go to Raines, Howard and other officer defendants herein, based on the Company's supposed performance since 2003, including periods in which earnings were misstated and the Company was grossly mismanaged, as alleged herein. By so acting, the members of this sham "Special Review Committee" also

21

avoided the possibility that defendants Raines and Howard would reveal the extent to which each of Fannie Mae's directors (including defendants Korologos, Marron and Ashley) were ultimately responsible to the Company for breaches of their corporate governance responsibilities as set forth herein.

83.  Despite the fact that Goldman Sachs conspired with certain individual defendants to create sham transactions to manipulate Fannie Mae's reported earnings, Fannie Mae has not commenced suit against it although Goldman Sachs has caused the Company substantial damages.  Further, even if the Company had commenced suit against Goldman Sachs arising from the wrongdoing alleged herein, because many of the Company's senior officers conspired with and were *in pari delicto* with Goldman Sachs and themselves responsible for the wrongdoing alleged herein, the Company is not in a position to pursue claims against Goldman Sachs objectively and without disabling conflicts of interest.

84.  Although chartered by Congress to oversee and regulate Fannie Mae, Freddie Mac, and other government-sponsored enterprises, OFHEO as a matter of law does not have exclusive authority to protect the interests of Fannie Mae's shareholders or otherwise address the wrongdoing at issue here.  OFHEO has never claimed for itself, nor acted as if it had, exclusive authority to protect the corporate interests of Fannie Mae or its shareholders in the face of conduct by its officers or directors that breach their fiduciary duties to Fannie Mae and its shareholders.  In fact, OFHEO has utterly failed in its oversight of Fannie Mae and it bears some of the responsibility for the debacle that ensued as a result of such failure.

85.  As a matter of fact, OFHEO has proven to be such a toothless and ineffectual regulator that bipartisan legislation is pending in Congress to abolish OFHEO and replace it with a stronger regulator with ample oversight powers.  The conduct described above occurred on OFHEO's watch, yet OFHEO not only failed to detect it, but in many cases acquiesced in the wrongdoing.  Indeed, OFHEO only launched its investigation of Fannie Mae after similar conduct – also undetected by OFHEO -- came to light at Freddie Mac.

86.  In the Freddie Mac shareholder derivative litigation (MDL No. 1584, S.D.N.Y.) commenced in the wake of the public exposure of Freddie Mac's undetected accounting fraud, substantially similar claims were asserted on Freddie Mac's behalf by its shareholders.  In that litigation, the derivative plaintiffs recovered $99 million for the benefit of Freddie Mac, as well as substantial therapeutic and corporate governance improvements.  OFHEO, on the other hand, levied a $125 million penalty *against* Freddie Mac, and its efforts to recoup any of that penalty from responsible Freddie Mac senior executives has, after more than three years of litigation, recovered nothing for it or its shareholders.  Similarly here, OFHEO and the SEC have extracted a $400 million penalty *from* Fannie Mae, but its belated administrative litigation against defendants Raines, Howard, and Spencer has produced nothing for the Company's benefit.  Nor is it likely that the litigation will produce anything, since OFHEO is so disabled, conflicted, and otherwise handicapped by its own previous acquiescence and nonfeasance respecting the activities of defendant Raines and the other defendants.

87.  Accordingly, this derivative action is both legally proper and factually necessary.

## CAUSES OF ACTION

### COUNT I

### BREACH OF FIDUCIARY DUTY BY OFFICER AND DIRECTOR DEFENDANTS

88. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

89. Each officer and director defendant owed Fannie Mae and its shareholders the highest fiduciary duties of loyalty, honesty, and care in conducting the Company's affairs, as set out above.

90. Each officer and director defendant knowingly, intentionally, recklessly or negligently breached their fiduciary and other duties owed to Fannie Mae and, thereby, caused the Company to waste its assets, expend corporate funds, suffer from the effect of remedial measures imposed and to be imposed upon the Company by regulators, and impair its reputation and credibility for no legitimate business purpose, as a result of which Fannie Mae has been and continues to be substantially damaged. Fannie Mae's current directors are further guilty of waste of the Company's corporate assets by having failed to cause the Company to aggressively and objectively pursue the defendants named herein to recover the Company's damages by, *inter alia*, appointing the "Special Review Committee" as a pretext for independent investigation of Fannie Mae's potential claims. Further, Fannie Mae has been and is exposed to substantial liability in connection with civil lawsuits caused by defendants' wrongdoing, to criminal liability, and to SEC and/or OFHEO enforcement actions.

91. Accordingly, plaintiff on behalf of Fannie Mae seeks from the officer and director defendants monetary damages, injunctive remedies, and other forms of equitable relief.

### COUNT II
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY BY KPMG

92.  Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

93.  Defendant KPMG knowingly, intentionally, recklessly, or negligently participated or acquiesced in the preparation, issuance, or dissemination of false or misleading audit opinions or financial statements concerning Fannie Mae, as set out above.

94.  As a result of these wrongful actions, defendant KPMG aided and abetted the breaches of fiduciary and other duties by the officer and director defendants.

95.  As a result of defendant KPMG's aiding and abetting the breaches of fiduciary and other duties by the officer and director defendants, Fannie Mae has been and continues to be substantially damaged.

96.  Accordingly, plaintiff on behalf of Fannie Mae seeks from defendant KPMG monetary damages, injunctive remedies, and other forms of equitable relief.

## COUNT III
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY BY GOLDMAN SACHS

97.  Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

98.  Defendant Goldman Sachs knowingly, intentionally, or recklessly designed and implemented sham transactions for the purpose of shifting income to different accounting periods, and knowingly, intentionally, or recklessly failed to make truthful, complete, or appropriate disclosures concerning those transactions, as set out above.

99.  As a result of these wrongful actions, defendant Goldman Sachs aided and abetted the breaches of fiduciary and other duties by the officer and director defendants.

100.   As a result of defendant Goldman Sachs' aiding and abetting the breaches of fiduciary and other duties by the officer and director defendants, Fannie Mae has been and continues to be substantially damaged.

101.   Accordingly, plaintiff on behalf of Fannie Mae seeks from defendant Goldman Sachs monetary damages, injunctive remedies, and other forms of equitable relief.

## COUNT IV
### INDEMNIFICATION FROM OFFICER AND DIRECTOR DEFENDANTS

102.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

103.   The officer and directors defendants, as agents of Fannie Mae, breached their fiduciary and other duties to Fannie Mae and its shareholders, as set out above.

104.   Fannie Mae has suffered and will suffer significant and substantial injury as a direct result of these breaches of the fiduciary and other duties owed to it.  Part of that injury suffered by Fannie Mae as a result of this wrongdoing by the officer and director defendants may be liability to investors, OFHEO, or any other party.

105.   Accordingly, plaintiff on behalf of Fannie Mae seeks from the officer and director defendants complete and full indemnification to the extent Fannie Mae is found liable for the wrongdoing of these defendants.

## COUNT V
### BREACH OF CONTRACT BY KPMG

106.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

107.  Defendant KPMG, as Fannie Mae's purportedly independent auditor, was contractually and professionally obligated to provide to the Company audits of its financial statements inconformity with GAAS, for which it was paid substantial sums.

108.  Defendant KPMG failed to provide the services it was contractually obligated to provide, as set out above.

109.  As a result of this breach of contract, Fannie Mae was substantially damaged.

110.  Accordingly, plaintiff on behalf of Fannie Mae seeks from defendant KPMG monetary damages.

## COUNT VI
### BREACH OF CONTRACT BY GOLDMAN SACHS

111.  Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

112.  Defendant Goldman Sachs, as the underwriter/dealer for the transactions establishing the REMIC Trusts, was contractually and professionally obligated to provide the Company these services consistent with GAAP, with legal and regulatory requirements mandating truthful, complete, and appropriate public disclosures concerning these transactions, and with the law generally.

113.  Defendant Goldman Sachs failed to provide the services it was contractually obligated to provide, as set out above and, further, failed to perform its contractual obligations to Fannie Mae in good faith and fairly.

114.  As a result of these breaches of contract, Fannie Mae was substantially damaged.

115.  Accordingly, plaintiff on behalf of Fannie Mae seeks from defendant Goldman Sachs monetary damages.

## COUNT VII
### NEGLIGENCE OF OFFICERS AND DIRECTORS

116. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

117. Each officer and director defendant was negligent in the performance of their responsibilities for the management and governance of Fannie Mae, as a result of which the Company was substantially damaged.

118. Accordingly, plaintiff on behalf of Fannie Mae seeks from the officer and director defendants monetary damages.

## COUNT IX
### VIOLATIONS OF SARBANES-OXLEY BY RAINES AND HOWARD

119. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

120. Defendants Raines and Howard, as Chief Executive Officer and Chief Financial Officer, respectively, signed off on the financial statements of Fannie Mae and, as such, were personally responsible for the accuracy thereof.

121. Such financial statements materially overstated the assets, earnings, and net worth of Fannie Mae, and defendants Raines and Howard engaged in misconduct when they approved them.

122. Pursuant to Section 304 of Sarbanes-Oxley, defendants Raines and Howard should be required to surrender to the Company all compensation or other benefits paid or payable by Fannie Mae that were based upon or otherwise tied to the financial statements that were materially false.

## COUNT X
### UNJUST ENRICHMENT OF OFFICER AND DIRECTOR DEFENDANTS

123.  Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

124.  Each officer and director defendant was unjustly enriched by the payments made to them as compensation and otherwise by the Company.

125.  Defendant Raines, from 1998 through 2004, while engaged in the wrongdoing set out above, received $22.6 million in salary and bonuses from Fannie Mae, plus $62 million in options and stock awards, and, in 2004, $200,000 for his use of corporate aircraft.

126.  Defendant Howard similarly received $7.7 million in salary and bonuses and $21.8 million in options and stock awards from Fannie Mae in those years.

127.  Other officer and director defendants also received bonuses and "incentive" payments that were unearned and based upon the artificially inflated earnings caused and/or acquiesced in by the individual defendants.

128.  Throughout the relevant period, each of the director defendants was paid substantial fees for attending meetings and otherwise occupying positions as directors of Fannie Mae. All of such payments and fees were unearned and unjustified since these directors so utterly failed to fulfill their responsibilities for the management and governance of the Company.

129.  As a result of the foregoing unjust enrichment, each of the officer and director defendants should be required to repay to Fannie Mae the respective amounts paid plus interest based upon each of these defendants' investment and retention of the proceeds of their unjust enrichment.

## PRAYER FOR RELIEF

Wherefore, plaintiff prays that the Court enter judgment against the defendants:

A.   declaring that the officer and director defendants have breached their fiduciary and other duties owed to Fannie Mae as alleged herein;

B.   awarding money damages against all defendants, jointly and severally, for all losses and damages sustained by Fannie Mae as a result of the acts, omissions and transactions complained of herein;

C.   directing all defendants, jointly and severally, to account for all losses and damages sustained by Fannie Mae caused by reason of the acts and omissions complained of herein;

D.   directing all defendants to remit to Fannie Mae all profits and other benefits and unjust enrichment they have obtained and retained as a result of the acts and omissions complained of herein, including all salaries, bonuses, fees, stock awards, options and common stock sales proceeds and the earnings upon such amounts by which the defendants were unjustly enriched and imposing a constructive trust thereon;

E.   ordering that defendants and those under their supervision and control refrain from further violations as are alleged herein and to implement corrective measures that will rectify all such wrongs as have been committed and prevent their recurrence;

F.   ordering the Company to sever all economic relations with KPMG and its partners;

G.  ordering the Company to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with Sarbanes-Oxley, including, but not limited to, putting forward for a shareholder vote resolutions for

amendments to the Company's by-laws or articles of incorporation and taking such other actions as may be necessary to place before shareholders for approval adoption of the following corporate governance policies:

 1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

 2. appropriately test and strengthen internal audit and control functions;

 3. rotate independent auditing firms every five years;

 4. control and limit insider stock selling;

 5. reform executive compensation;

 6. add at least three independent directors with no previous or existing relationships with Fannie Mae, its present or former officers or directors or with OFHEO;

H. awarding pre-judgment and post-judgment interest as allowed by law;

I. awarding punitive damages;

J. awarding disgorgement as provided by § 304 of Sarbanes-Oxley;

K .awarding plaintiff's attorneys' fees, expert fees, consultant fees and other costs and expenses; and

L. granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a jury trial.

Dated: June 29, 2007

**CUNEO GILBERT & LaDUCA, LLP**

BY: _____
JONATHAN W. CUNEO (D.C. Bar# 939389)
ROBERT J. CYNKAR (D.C. Bar# 947845)
DAVID W. STANLEY (D.C. Bar# 174318)
507 C Street, N.E.
Washington, DC 20002
202-789-3960

**GREENFIELD & GOODMAN, LLC**

RICHARD D. GREENFIELD
7426 Tour Drive
Easton, MD 21601
410-745-4149

**ANN MILLER, LLC**

ANN MILLER
834 Chestnut Street, Suite 206
Philadelphia, PA 19107
215-238-0468

Attorneys for Plaintiff

VERIFICATION

I, JAMES KELLMER, hereby declare and verify as follows'

I am the plaintiff in the above-captioned case. I have read the contents of the foregoing Complaint. I am informed and believe the matters related therein are true, based upon facts as related to me by my counsel, and on that ground 1. allege that the matters stated therein are true.

–JAMES KELLMER

33

M
07-1173
RJL

JS-44
(Rev.1/05 DC)

**CIVIL COVER SHEET**

## I (a) PLAINTIFFS

James Kellmer
409 S. Cranford Rd., Cherry Hill, NJ
Derivatively on behalf of Fannie Mae

88888

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** ___Camden___
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Jonathan W. Cuneo
Cuneo Gilbert & LaDuca LLP
507 C Street, NE
Washington, DC 20002
202-789-3960

## DEFENDANTS

Franklin D. Raines et al.

See attached for additional defendants

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

Case: 1:07-cv-01173
Assigned To : Leon, Richard J.
Assign. Date : 6/29/2007
Description: Contract

JURY ACTION

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government
Plaintiff

○ 2 U.S. Government
Defendant

Ⓧ 3 Federal Question
(U.S. Government Not a Party)

○ 4 Diversity
(Indicate Citizenship of
Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/
Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency
Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If
Administrative Agency is Involved)

○ **D. Temporary Restraining
Order/Preliminary
Injunction**

Any nature of suit from any category may
be selected for this category of case
assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**          OR          ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or
defendant
☐ 871 IRS-Third Party 26
USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure
of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational
Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC
Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced &
Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/
Exchange
☐ 875 Customer Challenge 12 USC
3410
☐ 900 Appeal of fee determination
under equal access to Justice
☐ 950 Constitutionality of State
Statutes
☐ 890 Other Statutory Actions (if
not administrative agency
review or Privacy Act

32

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☒ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ⊗ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☒ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊗ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Shareholder derivative suit under 12 USC 1723a alleging breach of fiduciary duty, etc.

**VII. REQUESTED IN COMPLAINT**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ _____   Check YES only if demanded in complaint
JURY DEMAND:   YES ☒   NO ☐

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☒   NO ☐   If yes, please complete related case form.

DATE  June 29, 2007    SIGNATURE OF ATTORNEY OF RECORD

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.



NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT
JUN 2 9 2007
RECEIVED