# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **JAMES KELLMER,** <br> **Derivatively on Behalf of** <br> **FANNIE MAE a/k/a Federal National** <br> **Mortgage Association and its shareholders,** <br><br> **Plaintiff,** <br><br> v. <br><br> **FRANKLIN D. RAINES, J. TIMOTHY** <br> **HOWARD, LEANNE SPENCER, DANIEL** <br> **H. MUDD, KENNETH M. DUBERSTEIN,** <br> **FREDERIC V. MALEK, ANNE M.** <br> **MULCAHY, H. PATRICK SWYGERT and** <br> **GOLDMAN SACHS GROUP, INC.,** <br><br> **Defendants,** <br><br> **and** <br><br> **FANNIE MAE a/k/a Federal National** <br> **Mortgage Association,** <br><br> **Nominal Defendant.** | **Case No. 07-cv-1173 RJL** |

## AMENDED COMPLAINT

### THE NATURE OF THE CASE

1.  Plaintiff, James Kellmer, a shareholder of Fannie Mae ("Fannie Mae" or "the Company"), brings this derivative action on behalf of the Company and its shareholders against current and former officers and directors and a third party to remedy defendants' breaches of fiduciary duty and other illegal accounting manipulations occurring from approximately 1998 through 2004 that resulted in an estimated $10.6 billion of losses to the Company, well over $1 billion in expenditures by the Company to recreate and

correct historical financial documents, massive expenses for legal and expert fees and substantial losses of goodwill ("Pre-2005 Claims"). Following in their wake was substantively related but different conduct on the part of Fannie Mae's senior management and Board during the period thereafter arising out of, *inter alia*, the failure of the Company's risk management, its substantial damages incurred as guarantor of questionable mortgage pools and other real-estate derivatives and concealment of its true earnings, assets and net worth, which conduct continues through the present. As a result of defendants' wrongful conduct, Fannie Mae has paid a $400 million civil monetary penalty to the Office of Federal Housing Enterprise Oversight ("OFHEO") and the Securities and Exchange Commission ("SEC") and agreed to implement certain costly remedial measures which, as post-2004 events have demonstrated, have largely failed to protect Fannie Mae and its shareholders from substantial damages. Defendants' illegal actions have also caused the Company to be named as a defendant in securities fraud and ERISA class actions, as well as in other, individual securities fraud actions as a direct result of the wrongdoing described herein, all of which has exposed Fannie Mae to additional billions of dollars in damages. Finally, this scandal has caused the Company's stock price to plummet, causing Fannie Mae to lose over $31 billion in valuable market capitalization through 2005 and weakened its credit ratings as well as its reputation. Since late 2005, when Fannie Mae's top management was replaced, current management led by defendant Mudd, has replayed the earlier wrongdoing and subjected the Company to a new round of litigation and claims by investors and, as well, upon information and belief, a new round of investigations.

2.   At bottom, defendants' illegal financial manipulations were animated by former management's unbounded greed – artificially inflating their annual bonuses and other compensation of senior executives that was linked to the Company's reported (as distinct from actual) earnings per share ("EPS").  Senior management manipulated Fannie Mae's accounting to falsely reach EPS targets so as to reap staggering, undeserved bonuses for themselves and their confederates.  For example, over $52 million of defendant Raines' compensation of $90 million during this period was directly the result of "achieving" EPS targets (while his actual salary for the period totaled $6.5 million).

3.   Defendants' wrongful conduct arose in part from an arrogance borne of the special status and privileges of Fannie Mae, being a privately owned and managed, yet federally chartered, corporation.  As defendant Mudd observed, "We used to, by virtue of our peculiarity, be able to write, or have written, rules that worked for us."  Rules that "worked" for defendants, as opposed to the Company, allowed them to "cook the books" – to manipulate earnings figures and ignore Generally Accepted Accounting Principles ("GAAP") – in order to astronomically increase executive bonuses.  Those ill-gotten millions are particularly offensive because they stand in stark contrast to the fundamental purpose of Fannie Mae – to facilitate the financing of affordable housing for low- and middle-income families.

4.   In sum, as OFHEO reported in May 2006:

> • Fannie Mae senior management promoted an image of the [Company] as one of the lowest-risk financial institutions in the world and as "best in class" in terms of risk management, financial reporting, internal control, and corporate governance. The findings in this report show that risks at Fannie Mae were greatly understated and that the image was false.

3

- During the period … 1998 to mid-2004 … Fannie Mae reported extremely smooth profit growth and hit announced targets for earnings per share precisely each quarter. Those achievements were illusions deliberately and systematically created by the [Company's] senior management with the aid of inappropriate accounting and improper earnings management.

- A large number of Fannie Mae's accounting policies and practices did not comply with Generally Accepted Accounting Principles (GAAP). The [Company] also had serious problems of internal control, financial reporting, and corporate governance. Those errors resulted in Fannie Mae overstating reported income and capital by a currently estimated $10.6 billion.

- By deliberately and intentionally manipulating accounting to hit earnings targets, senior management maximized the bonuses and other executive compensation they received, at the expense of shareholders….

- Fannie Mae's Board of Directors contributed to those problems by failing to be sufficiently informed and to act independently of its chairman, Franklin Raines, and other senior executives; by failing to exercise the requisite oversight over the [Company's] operations; and by failing to discover or ensure the correction of a wide variety of unsafe and unsound practices.

- The Board's failures continued in the wake of revelations of accounting problems and improper earnings management at Freddie Mac and other high profile firms, the initiation of OFHEO's special examination, and credible allegations of improper earnings management made by an employee of the [Company's] Office of the Controller.

- Fannie Mae senior management sought to interfere with OFHEO's special examination by directing the [Company's] lobbyists to use their ties to 1) generate a Congressional request for the Inspector General of the Department of Housing and Urban Development (HUD) to investigate OFHEO's conduct of the examination and 2) insert into an appropriations bill language that would reduce the agency's appropriations until the Director of OFHEO was replaced.

5. By letter dated September 24, 2004, in compliance with Rule 23.1 of the Federal Rules of Civil Procedure, plaintiff, through his counsel, made a demand on the Fannie Mae Board of Directors ("the Board") to pursue, through litigation, the claims alleged in this action and name as defendants those identified above, among others responsible for

4

the wrongdoing as alleged herein. With the exception of a belated lawsuit against KPMG, Fannie Mae's Board has not taken any of the actions demanded by plaintiff in that letter. Indeed, to date, even after 3 years, the Board has not even replied. Further, even as to Fannie Mae's action against KPMG, it leaves itself vulnerable to KPMG's *in pari delecto* defense.

6. Accordingly, plaintiff's demands to sue the defendants named herein were effectively rejected by the Board. As a result, plaintiff initially commenced suit against, *inter alia*, many of the defendants named herein on January 10, 2005. In his Complaint, plaintiff alleged, as he has in this Complaint, that he had made a demand upon Fannie Mae's Board to institute this action, which was effectively rejected by the lack of action or response by the Board.

7. On February 14, 2005, the Court entered an Order consolidating plaintiff's initial derivative action and a distinct action brought against Fannie Mae under and pursuant to §220 of the Delaware Business Corporation Law seeking certain "books and records" with six other derivative cases, appointing the plaintiffs in two of those cases as so-called "Lead Plaintiffs" and appointing their counsel as "Lead Counsel." None of the other plaintiffs suing derivatively, including "Lead Plaintiffs," had made a demand upon Fannie Mae's Board, as plaintiff Kellmer had done in compliance with Rule 23.1. Subsequently, "Lead Plaintiffs" filed a consolidated derivative complaint, later superseded by an amended consolidated complaint. Although styled a consolidated complaint, their amended complaint did not name plaintiff Kellmer as one of the plaintiffs therein, advance plaintiff Kellmer's claims or rely upon his demand upon

Fannie Mae's Board. Instead, it alleged that demand was futile and that it was, therefore, excused.

8. Defendants moved to dismiss the amended consolidated derivative complaint on the grounds, *inter alia*, that the "Lead Plaintiffs" had not made a demand on Fannie Mae's Board and that demand was not futile. On May 31, 2007, the Court issued a Memorandum Opinion and Order (the "Opinion") dismissing the amended consolidated derivative complaint on the sole ground that demand was not futile. The Court did not address plaintiff Kellmer's claims, nor his demand, particularly since "Lead Counsel" had not made him a party to the amended consolidated derivative complaint. Likewise, the Court did not purport to dismiss plaintiff Kellmer's substantive claims, nor as a matter of law could it, although in a footnote to the Opinion, reference was made to plaintiff Kellmer's case. .

9. The Clerk's Office, however, has marked the electronic docket in this case (1:05-cv-0037) as "CLOSED." For that reason, among others, plaintiff Kellmer recommenced suit under the instant docket number, 1:07-cv-1173. The claims asserted therein, as well as those in this Amended Complaint, nevertheless relate back in all respects to plaintiff's original filing on January 10, 2005.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over the subject matter of this action pursuant to 12 U.S.C. § 1723a.

11. This action was not brought collusively to confer jurisdiction on a court of the United States that would not otherwise have jurisdiction.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, among other things, many of the acts alleged and complained of herein occurred in this District.

13. Plaintiff brings this action derivatively on behalf of nominal defendant Fannie Mae and its shareholders. No claims are asserted against Fannie Mae. Plaintiff will adequately and fairly represent the interests of Fannie Mae and its shareholders in enforcing and prosecuting their rights.

### THE PARTIES

### A. PLAINTIFF

14. Plaintiff James Kellmer is a New Jersey domiciliary who owns and has owned common stock of Fannie Mae at all times relevant hereto.

### B. NOMINAL DEFENDANT

15. Nominal defendant Fannie Mae is a federally chartered corporation originally established in 1938. The Company became a stockholder-owned and privately managed corporation in 1968. Fannie Mae is in the business of purchasing mortgages from banks and mortgage lenders in the secondary mortgage market and thereby providing additional liquidity for those banks and lenders. Its principal place of business is located at 3900 Wisconsin Avenue, N.W., Washington, D.C.

### C. OFFICER DEFENDANTS

16. Defendant Franklin D. Raines served as Chairman of Fannie Mae and its Chief Executive Officer ("CEO") from January 1999 until his resignation on December 21, 2004.

17. Defendant J. Timothy Howard was employed by Fannie Mae from 1982 until his resignation in December 2004. He served as Chief Financial Officer of Fannie Mae from

1990 until his resignation and as Executive Vice President from 1990 to May 2003. He was a director from 2003 until his resignation, and served as Vice Chairman from May 2003 until his resignation.

18. Defendant Leanne Spencer served as Senior Vice President and Controller of Fannie Mae from 1999 until she "stepped down" from those positions on January 17, 2005. She continued in a non-officer capacity as a Special Advisor for a period thereafter.

19. Defendant Daniel H. Mudd served as Chief Operating Officer of Fannie Mae and Vice Chairman of its Board beginning in February 2000. Upon defendant Raines' resignation on December 21, 2004, he assumed the position of interim CEO and Executive Vice President and served in those capacities until June 2005, when he was appointed CEO and President of the Company. He continues to serve in such positions.

### D. DIRECTOR DEFENDANTS

20. Defendant Kenneth M. Duberstein has served as a member of the Board of Fannie Mae since 1998.

21. Defendant Frederic V. Malek served as a member of the Board of Fannie Mae from 2002 until his resignation at the end of 2005.

22. Defendant Anne M. Mulcahy served as a member of the Board of Fannie Mae from 2000 until her resignation on October 19, 2004.

23. Defendant H. Patrick Swygert has served as a member of the Board of Fannie Mae since 2000.

### E. GOLDMAN SACHS

24. Defendant Goldman Sachs Group, Inc. ("Goldman Sachs") is an integrated financial institution that provided investment banking, underwriting, and advisory services to Fannie Mae and participated directly in certain of the wrongdoing alleged herein.

### F. NON-PARTY KPMG

25. KPMG LLP ("KPMG") is an international certified public accounting firm that served as Fannie Mae's purportedly independent auditor from 1969 until December 21, 2004. While KPMG is not a defendant herein, it was heavily involved in and facilitated the actions and inactions of the named defendants and others that are at the core of this litigation.

### GENERAL ALLEGATIONS

### A. THE OPERATIONS OF FANNIE MAE

26. Fannie Mae is the nation's largest source of financing for home mortgages, typically those costing $417,000 or less. As defendant Mudd is quoted as saying in the San Francisco Chronicle: "The business that we are actually in is doing affordable, middle-class, plain old 30-year, 15-year fully amortized lending. We've done it since just after World War I and we are very good at it." In fact, Fannie Mae has been caused by its senior management and Board to go very far afield from this mission and has become the equivalent of a gambling casino. While chartered by the federal government, and having certain privileges as a result – such as an exemption from state and local income taxes – Fannie Mae is a private, shareholder-owned company and its common stock is publicly traded on the New York Stock Exchange. Its obligations are not backed by the full faith

9

and credit of the United States. Fannie Mae does not loan money directly to consumers. Rather, the Company buys mortgages from banks, thereby freeing up the banks' limited capital, which in turn allows them to make more loans. The goal of these operations is to encourage home-ownership, especially by low- and middle- income families. However, due to serial mismanagement, it has done so by accepting negligently ever-increasing risks in order to provide the funds needed to finance such mortgage loans and in making them.

27. Fannie Mae's profit-making operations are based on two components. In its credit guarantee business, the Company gets a fee for guaranteeing the payments on the mortgages it buys, which it then re-sells to investors, usually in the form of mortgage-backed securities (that is, beneficial interests in pools of mortgage loans or other mortgage-related securities issued by Fannie Mae).

28. In its portfolio investment business, Fannie Mae holds the mortgages and mortgage-related securities and other investments that it purchases from banks, other lenders, securities dealers, and other investors. Some of such "investments" were and/or are high-risk derivatives which were packaged and sold by intermediaries with little regard for the underlying security, all of which has subjected Fannie Mae to billions of dollars of undisclosed risk, much of which has yet to be reflected in its current financial statements. The Company also purchases short-term, non-mortgage assets for liquidity and investment purposes. Fannie Mae funds these portfolio purchases by issuing short and long term debt, and by selling debt securities to domestic and international investors. Fannie Mae profits to the extent that the yield on the mortgage assets and other

investments in its portfolio exceeds the cost of the debt securities it issued to fund those portfolio investments.

29. Fannie Mae's business is subject to several risks common to financial institutions, some of which have not yet been adequately quantified and/or otherwise reflected on its financial statements particularly those which reflect "investments" in questionable securitized derivative products and the purchase of non-recourse mortgage portfolios. Most mortgage borrowers in the United States can prepay their mortgages at any time without any penalty. Thus, when interest rates decline, borrowers refinance their mortgages at lower rates, causing their original mortgages to have a shorter life than the lender projected. Consequently, when interest rates drop, the investment yield on Fannie Mae's mortgage-related investments is reduced. When this occurs, Fannie Mae receives cash as the older, higher-rate mortgages are paid off, but faces the risk that it will not be able to reinvest this cash at rates that are above the rates it is required to pay on its outstanding debt securities. This risk is called "prepayment risk."

30. Fannie Mae also faces significant risk of non-payment of the underlying mortgages it holds, particularly if there is inadequate borrowers' equity, over-valued appraisals of the underlying real estate and lax loan underwriting, all of which circumstances have been prevalent in the post-2004 period. These risks are compounded by the lack of legal and/or practical recourse that Fannie Mae has against the originators of such excessive risk mortgages or pools or related derivatives when defaults arise, all of which is compounded when the Company's financial statements do not accurately reflect, in the form of adequate provisions for loan losses, the collectability of its loan portfolios or other deterioration in the value of mortgage-related assets. Even after the debacle

11

described herein which led to the assertion of the Pre-2005 Claims, the Company continued to overstate its earnings, assets and net worth by material amounts by failing to make adequate provision for its high-risk loans and its failure to mark to market or otherwise re-value downward by material amounts its "investments" to reflect reality.

31. Another risk is linked to the short-term and long-term debt Fannie Mae issues to fund its mortgage purchases. When interest rates decline, Fannie Mae's cost of issuing new short-term debt also declines, but it is required to pay the original and higher interest rates on its longer-term debt until that previously issued debt matures or can be called. This risk is called "interest rate risk."

32. Consequently, interest rate fluctuations and prepayment risks expose Fannie Mae to radical earnings volatility from quarter to quarter. To offset or hedge against these risks, Fannie Mae typically engages in a variety of derivative transactions and related hedges. As the name implies, a derivative is an asset the value of which derives from the value of some other asset. In effect, a derivative transaction is a side bet on interest rates, exchange rates, commodity prices, and so on. Derivative transactions used by Fannie Mae include issuing callable debt, interest rate swaps, options to enter into interest rate swaps ("swaptions"), interest rate caps and floors, foreign currency swaps, and forward starting swaps. Other than those derivative transactions used by the Company's management to manipulate its reported earnings, many of these transactions reflect Fannie Mae's legitimate hedging activities while others were used to boost financial returns without due regard for the underlying risks faced by the holders of such "investment" vehicles. The SEC's Chief Accountant has called Fannie Mae "one of the largest users of derivatives in the world." When such derivatives are used to offset

earnings volatility legitimately in the form of a hedge, they can be a proper and, indeed, beneficial aspect of the Company's business model. When used improperly as an artificial means of manipulating reported earnings to, *inter alia*, generate an arguable justification for paying bonuses based thereupon, such derivatives cannot be justified.

### B. DUTIES OF FANNIE MAE'S OFFICERS AND DIRECTORS

33. The officers and directors of Fannie Mae have and at all times relevant hereto had a duty to:

(a) manage, conduct, supervise, and direct the business affairs of Fannie Mae in accordance with all applicable law, government rules and regulations, and the charter and bylaws of Fannie Mae;

(b) neither engage in self-dealing nor permit any officer, director, or employee of Fannie Mae to engage in self-dealing;

(c) neither violate nor knowingly permit any officer, director, or employee of Fannie Mae to violate applicable laws and regulations;

(d) remain informed as to the status of Fannie Mae's operations, including its expenses in relation to prepayment of mortgages and its accounting for derivative contracts;

(e) upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the law and their duty of candor to Fannie Mae's shareholders;

(f) prudently protect the Company's assets;

(g) maintain and implement an adequate, functioning system of internal legal, financial, and accounting controls, such that the Company's financial statements – including its expenses, accounting for derivative contracts, and other financial information – would be accurate and the actions of Fannie Mae's directors would be in accordance with all applicable laws; and

(h) supervise the preparation and filing of any financial reports or other information required by law from Fannie Mae and to examine and evaluate any reports of examinations, audits or other information concerning the financial affairs of Fannie Mae, and to make full and accurate disclosure of all material facts concerning them including reporting accurately Fannie Mae's earnings, assets and net worth.

### C. WRONGFUL CONDUCT OF THE COMPANY'S OFFICERS AND DIRECTORS

34. Under the executive compensation program at Fannie Mae, senior management reaped financial rewards when the Company met EPS growth targets established, measured, and set by senior management itself. Beyond the basic package of salary and benefits, three significant components of compensation depended directly on reaching EPS targets: 1) the Annual Incentive Plan ("AIP"), under which by 2003 more than 700 employees were eligible for bonuses; 2) the Performance Share Plan, which granted stock to the 40-50 senior executives based on 3-year performance cycles; and 3) the EPS Challenge Grant, a company-wide program championed by defendant Raines that tied the award of a substantial amount of stock options to the doubling of core business EPS from 1998 to 2003.

35. The AIP bonus pool grew from $8.5 million in 1993 to $65.1 million in 2003. Bonuses for executives often totaled more than their annual salary. For senior

executives, such as defendants Raines, Howard and Spencer, EPS-driven compensation dwarfed basic salary and benefits.

36. This compensation structure at Fannie Mae greatly increased the incentive for senior executives to manipulate both the Company's EPS and its EPS targets. Indeed, Fannie Mae senior management achieved the Company's earnings targets pre-2005 by regularly manipulating accounts and accounting rules, calibrating repurchases of shares and debt to achieve EPS targets, entering into questionable transactions, and misallocating resources. Management routinely shifted earnings to future years when the EPS target for the maximum bonus payout for the current year appeared likely. Subsequent to 2004, although the earlier manipulations appear to have ceased, Fannie Mae's assets, earnings and net worth were nevertheless overstated by material amounts due to, *inter alia*, management's failure to make adequate provision for loan losses and from the excessive and imprudent risks they intentionally caused the Company to accept.

37. Fannie Mae's Board and its committees utterly failed to meet their obligations to ensure the safety and soundness of the Company's management and operation or to be justifiably satisfied that its financial statements were prepared in accordance with GAAP and that they were audited in compliance with Generally Accepted Auditing Standards ("GAAS"). The Board failed to stay appropriately informed of corporate strategy, to assure appropriate delegations of authority, to ensure that Board committees functioned effectively, to provide an appropriate check on defendant Raines and other top officers of the Company, and to exercise independence and vigilance in supervising management on behalf of the Company and its shareholders. Even with replacements of Fannie Mae's senior management in late 2004 and new directors being added to the Board thereafter,

the Board failed again in its oversight of such management, its imprudent acceptance of risks and the generation of financial statements prepared in accordance with GAAP that were audited consistent with GAAS.

38. As a result of these actions, the defendants either breached or aided and abetted the breach of the fiduciary obligations of Fannie Mae's officers and directors to the Company and its shareholders and, as well, caused its assets to be wasted.

### 1. IMPROPER DEFERRAL OF INCOME AND EXPENSES TO SUBSEQUENT PERIODS

39. As noted above, the volatility of interest rates has an immediate, and often significant, effect on Fannie Mae's income. The governing principles of GAAP reflect this economic reality. Under Financial Accounting Standards Board Statement of Financial Accounting Standard ("FAS") 91, Fannie Mae must recognize adjustments to its income by estimating the effective yield of it mortgages and mortgage securities every time it reports results to investors. In doing so, Fannie Mae must consider how fast homeowners might prepay their mortgages, adjust the effective yields on its securities, and make a new estimate about future repayments. This revision in expected yields must be booked immediately as an adjustment to interest income.

40. Prior to 2005, the senior management of Fannie Mae regularly violated FAS 91 to hit EPS targets. For example, in 1998, internal projections of financial results showed that the Company would have unanticipated amortization costs of $440 million, a number which should have adjusted Fannie Mae's income downwards under FAS 91. However, complying with FAS 91 would have caused the Company's EPS to fall below the minimum bonus target range, resulting in no bonuses for Fannie Mae's senior executives.

41. Rather than complying with GAAP by reducing the Company's income by $440 million, management adjusted it by only $240 million, "deferring" the remaining $200 million in expenses to subsequent years. This amount became known as the "catch-up."

42. Moreover, the reserve established by this deferral, commonly called a "cookie jar" reserve, itself violated GAAP (FAS 5), which prohibits the establishment of a reserve for general or unspecified business risks.

43. KPMG, the Company's supposedly-independent auditor, initially disagreed with the Company's refusal to fully book the $440 million shortfall, but ultimately, due to its lack of independence and relationships with, *inter alia*, defendants Raines, Howard and Spencer, the fact that Fannie Mae was one of its most significant clients and otherwise, acquiesced to the individual officer defendants' manipulation and termed this deferral an "audit difference." All the while, the members of Fannie Mae's Board failed to adequately oversee KPMG's purported audits of the Company's financial statements and did not properly satisfy themselves that such audits were carried out in conformity with GAAS.

## 2.  IMPROPER USE OF HEDGE ACCOUNTING ON DERIVATIVE CONTRACTS

44. During the period at issue, as indicated above, Fannie Mae was one of the world's largest users of derivatives, which are intended to act as a hedge against the volatility of the financial markets. Under GAAP (FAS 133), all derivatives are to be recorded as either assets or liabilities on a company's balance sheets at their fair value, unless they qualify for "hedge accounting." Hedge accounting provides a means for matching the earnings effect of a derivative and the related designated hedge transaction, thereby mitigating the volatility of earnings on a company's books when a company is

successfully hedging. However, under GAAP, if a company's hedges are ineffective in offsetting the specific risk being hedged, that result, whether negative or positive, must be recorded. If there is a low correlation between the changes in value of a derivative and the changes in value of the hedged item, an increased volatility in earnings will be – or should be – apparent on a company's books.

45. For a company with a huge and dynamic hedging program such as Fannie Mae, hedge accounting poses major operational challenges to ensure the continuing effectiveness of its hedging instruments. As OFHEO concluded with respect to the pre-2005 period, "By inappropriately assuming that the vast majority of its derivatives were 'perfectly effective' hedges, the hedging system adopted by Fannie Mae management achieved the volatility-dampening benefits of hedge accounting without the need to address the associated operational challenges." As a result, "Fannie Mae's improper implementation of FAS 133 masked billions of dollars of earnings volatility," all of which was known or should have been known by the defendants, their colleagues and KPMG. Even following the foregoing OFHEO report, Fannie Mae's senior management once again concealed the material degree to which the Company's derivatives had declined in value and were not marked to market on its balance sheets, all of which was in violation of FAS 133.

46. In its SEC filing at the close of 2005, Fannie Mae identified its improper application of hedge accounting as one of the two most significant reasons for its need to lower its reported earnings through 2004 by $10.6 billion. As to subsequent periods, its management has yet to own up to the on-going misapplication of hedge accounting.

### 3.  MISCELLANEOUS MANIPULATIONS

47. Prior to 2005, Fannie Mae's management employed a variety of clever and corrupt schemes to manipulate the appearance of the Company's financial performance so as to secure the extraordinary bonuses to which they were in fact not entitled in which Fannie Mae's Board acquiesced. As OFHEO has now reported, the Company's management:

- deliberately developed and adopted accounting policies to spread estimated income or expense that exceeded predetermined thresholds over multiple periods;

- established a materiality threshold for estimated income and expense, within which management could avoid making adjustments that would otherwise be required under GAAP;

- made discretionary adjustments to the financial statement for the sole purpose of minimizing volatility and achieving desired financial results;

- forecasted and managed future unrecognized income associated with misapplied GAAP;

- capitalized reconciliation differences as 'phantom' assets or liabilities and amortized them at the same speeds as 30-year fixed-rate mortgages;

- developed estimation methods that were inconsistently applied to retrospective and prospective amortization required by GAAP for current and future periods;

- developed and implemented processes to generate multiple estimates of amortization and varying assumptions in order to select estimates that provided optimal accounting results;

- failed to properly investigate the concerns of an employee regarding illogical and anomalous amortization results, along with a further allegation by that employee of an intent to misstate reported income; and

- tolerated significant weaknesses in internal controls surrounding the amortization process.

### 4. OTHER MISCONDUCT

48. It was only in late 2003, when the Federal Home Loan Mortgage Corporation ("Freddie Mac") was forced to restate its earnings following the replacement of its independent auditors, that regulators woke up to the wrongdoing at Fannie Mae. OFHEO, and subsequently the SEC, conducted investigations that confirmed the wrongful conduct set out above.

49. On December 21, 2004, in the face of severe criticism from OFHEO (which had, itself, been grossly negligent in its oversight of Fannie Mae and Freddie Mac) and the SEC, the Company's directors compounded the breach of their duties to Fannie Mae by refusing to fire defendants Raines and Howard for cause and demanding disgorgement of their ill-gotten millions. Instead, the Board accepted the resignations of these defendants with the knowledge that, by so doing, they would cause the further waste of Fannie Mae's corporate assets.

50. As a result, defendants Raines and Howard became arguably entitled to collect tens of millions of dollars in severance benefits under the new no-fault termination provisions in their employment contracts (added in 2004 after OFHEO had finally begun to investigate) and to keep millions of dollars in previously received bonuses and stock sales that the Company was entitled to rescind under Sarbanes-Oxley and should have rescinded given what they knew or should have known about Fannie's material overstatement of its earnings, assets and net worth.

### D. WRONGFUL CONDUCT OF GOLDMAN SACHS

51. Defendant Goldman Sachs, together with Fannie Mae officers, intentionally designed and implemented sham transactions with no legitimate business purpose in

order to create losses for Fannie Mae and create the false appearance that Fannie Mae's earnings were stable and not volatile. According to an article in The New York Times, "…Goldman Sachs was injecting dangerous financial products into the world's bloodstream for years." These "products" were integral to Goldman Sachs' dealings with the Company as described below.

52.  Specifically, in the fourth quarter of 2001, and the first quarter of 2002, Goldman Sachs, for its unjust economic benefit, devised and executed a series of Fannie Mae $20 billion and $10 billion Real Estate Mortgage Investment Conduit ("REMIC") transactions (Fannie Mae REMIC Trusts 2001-81 and 2002-21).  Goldman Sachs was the underwriter/dealer for both REMIC Trusts.  These REMIC transactions had no legitimate economic or business purpose.  Their sole purpose was to shift artificially $10 million of Fannie Mae's earnings into future years, in which years the Company's reported earnings were artificially overstated.

53.  Entering into transactions that have no economic purpose other than shifting income is a violation of GAAP.  In addition, the transactions were not accounted for properly, in part because of internal control deficiencies at Fannie Mae, including the Company's lack of systems to account for the transactions properly, facts known or which should have been known to the Board.  KPMG knew or should have known of the existence of such sham transactions and the fact that they were not accounted for by Fannie Mae in accordance with GAAP; it did nothing to ameliorate such false accounting, all of which was known or should have been known by the Company's senior management and members of its Board of Directors.

54.  Neither Fannie Mae's management nor Goldman Sachs made truthful, complete, or appropriate disclosures in the associated prospectus supplements for the foregoing REMIC Trusts, Fannie Mae financial statements, or other public statements about the transactions.  To the contrary, Fannie Mae's management and Goldman Sachs conspired to create a joint strategy of false and deceptive public statements, actively trying to conceal the purpose and true nature of these transactions, all of which was facilitated by KPMG.  Upon information and belief, Goldman Sachs, acting as broker, dealer and/or other intermediary sold to Fannie Mae high-risk derivative and other "dangerous financial products" causing it substantial damages in an amount which cannot presently be determined.

### E. THE NECESSITY OF THIS DERIVATIVE ACTION

55.  On September 24, 2004, as required by Rule 23.1 of the Federal Rules of Civil Procedure, plaintiff, through his legal counsel, made a written demand on the Fannie Mae Board to institute this action.  The Board neither responded to that demand nor took the actions demanded, with the exception of its belated lawsuit against KPMG.  As such, those demands are deemed rejected.

56.  Another demand was subsequently made by another shareholder.  In response, the Board voted improperly to appoint a sham "Special Review Committee" consisting of three directors, Marron, Korologos, and Ashley, three of the directors responsible for the wrongdoing alleged herein – purportedly to "investigate" such claims of wrongdoing, including the claims against themselves.  Although such directors were named as defendants in the Complaint in this action and are culpable, plaintiff has entered into an agreement with them which, *inter alia*, tolls all statutes of limitation applicable to their

conduct. They are subject to being re-named as defendants at the option of plaintiff. Under Fannie Mae's Charter, Section 308(b), given the directors' self-interest in protecting themselves, these directors should have been barred from any such role and their appointment evidenced the Board's refusal to deal with Fannie Mae's claims fairly, objectively and in its sole interest.

57. In the three years since the initial written demand was made on behalf of plaintiff upon Fannie Mae's Board, neither the directors nor this "Special Review Committee" has taken any effective action to recover the Company's existing and future damages from the wrongdoers. Although Fannie Mae has commenced suit itself against KPMG, because many of its senior officers conspired with and were *in pari delicto* with KPMG and themselves responsible for the wrongdoing alleged herein, the Company is not in a position to pursue claims against KPMG objectively and free of disabling conflicts of interest.

58. Indeed, far from acting in the interest of the Company, each of the members of the "Special Review Committee" and the Company's Board as a whole permitted a further waste of Fannie Mae's assets when they voted to permit defendants Raines and Howard to resign their positions rather than being fired for cause and misconduct, thereby costing the Company $19 million in future payments to defendant Raines alone. Moreover, these very same directors have caused or otherwise participated in the decision of the Board which caused Fannie Mae to petition OFHEO to allow Fannie Mae to release millions of dollars of incentive payments, much of which would go to Raines, Howard and other culpable persons, based on the Company's supposed performance since 2003, including periods in which earnings were misstated and the Company was grossly mismanaged, as

alleged herein. By so acting, the members of this sham "Special Review Committee" also avoided the possibility that defendants Raines and Howard would reveal the extent to which each of Fannie Mae's directors was ultimately responsible to the Company for breaches of his or her corporate governance responsibilities as set forth herein.

59. Despite the fact that Goldman Sachs conspired with certain individual defendants to create sham transactions to manipulate Fannie Mae's reported earnings and knowingly aided and abetted their breach of fiduciary duty, Fannie Mae has not commenced suit against it although Goldman Sachs has caused the Company substantial damages. Further, even if the Company had commenced suit against Goldman Sachs arising from the wrongdoing alleged herein, because many of the Company's senior officers conspired with and were *in pari delicto* with Goldman Sachs and themselves responsible for the wrongdoing alleged herein, the Company is not in a position to pursue claims directly on behalf of the Company against Goldman Sachs objectively and without disabling conflicts of interest.

60. Although chartered by Congress to oversee and regulate Fannie Mae, Freddie Mac, and other government-sponsored enterprises, OFHEO as a matter of law does not have exclusive authority to protect the interests of Fannie Mae, its shareholders or otherwise address the wrongdoing at issue here. OFHEO has never claimed for itself, nor acted as if it had, exclusive authority to protect the corporate interests of Fannie Mae or its shareholders in the face of conduct by its officers or directors that breach their fiduciary duties to Fannie Mae and its shareholders. In fact, OFHEO has utterly failed in its oversight of Fannie Mae and it bears some of the responsibility for the debacle that ensued as a result of such failure.

61. As a matter of fact, OFHEO has proven to be such a toothless and ineffectual regulator that bipartisan legislation has been pending in Congress to abolish OFHEO and replace it with a stronger regulator with ample oversight powers. The conduct described above occurred on OFHEO's watch, yet OFHEO not only failed to detect it, but in many cases acquiesced in the wrongdoing. Indeed, OFHEO only launched its investigation of Fannie Mae after similar conduct – also undetected by OFHEO – came to light at Freddie Mac.

62. In the Freddie Mac shareholder derivative litigation (MDL No. 1584, S.D.N.Y.), commenced in the wake of the public exposure of Freddie Mac's undetected accounting fraud, substantially similar claims were asserted on Freddie Mac's behalf by its shareholders. In that litigation, the derivative plaintiffs played a major role in the recovery of $99 million from its officers and directors as well as co-conspirators (such as Goldman Sachs is here) for the benefit of Freddie Mac, as well as substantial therapeutic and corporate governance improvements. OFHEO, on the other hand, levied a $125 million penalty *against* Freddie Mac, and its efforts to recoup any of that penalty from responsible Freddie Mac senior executives has, after more than three years of litigation, recovered relatively little for it or its shareholders. Similarly here, due to the actions of Fannie Mae's officers and directors, OFHEO and the SEC have extracted a $400 million penalty *from* the Company, but its belated administrative litigation against defendants Raines, Howard, and Spencer has produced nothing for the Company's benefit. Nor is it likely that the litigation will produce anything, since OFHEO is disabled, conflicted, and otherwise handicapped by its own previous acquiescence and nonfeasance respecting the activities of such defendants.

25

63. Accordingly, this derivative action is both legally proper and factually necessary.

**CAUSES OF ACTION**

**COUNT I**
**BREACH OF FIDUCIARY DUTY BY OFFICER AND DIRECTOR DEFENDANTS**

64. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

65. Each officer and director defendant owed Fannie Mae and its shareholders the highest fiduciary duties of loyalty, honesty, and care in conducting the Company's affairs, as set out above.

66. Each officer and director defendant knowingly, intentionally, recklessly or negligently breached his or her fiduciary and other duties owed to Fannie Mae and its shareholders and, thereby, caused the Company to waste its assets, expend corporate funds, suffer from the effect of remedial measures imposed and to be imposed upon the Company by regulators, and impair its reputation and credibility for no legitimate business purpose, as a result of which Fannie Mae has been and continues to be substantially damaged. Each of its directors knew or should have known that the Company's financial statements were not prepared in conformity with GAAP and that the purported audits of those financial statements by KPMG during the relevant period were not carried out in accordance with GAAS. Distinct from the foregoing Pre-2005 Claims, Fannie Mae's current directors are further guilty of waste of the Company's corporate assets by having failed to cause the Company to aggressively and objectively pursue the defendants named herein to recover the Company's damages as well others implicated in such wrongdoing by, *inter alia*, appointing the "Special Review Committee" as a pretext for independent investigation of Fannie Mae's potential claims. Further, Fannie Mae has

been and is exposed to substantial liability in connection with civil lawsuits caused by defendants' wrongdoing, to criminal liability, and to further SEC and/or OFHEO enforcement actions. Indeed, despite the increased attention paid to the accuracy of Fannie Mae's financial statements and the procedures implemented in the wake of the settlement with OFHEO and the SEC, the Company's assets, earnings and net worth continue to be overstated by material amounts as a result of the inadequacy of its reserves, even after reporting a loss of $1.4 billion for the quarter ended September 30, 2007.

67. Accordingly, plaintiff on behalf of Fannie Mae and its shareholders seeks from the officer and director defendants monetary damages, injunctive remedies, and other forms of equitable relief.

### COUNT II
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY BY GOLDMAN SACHS

68. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

69. Defendant Goldman Sachs knowingly, intentionally, or recklessly designed and implemented sham transactions for the purpose of shifting Fannie Mae's income to different accounting periods, and knowingly, intentionally, or recklessly failed to make truthful, complete, or appropriate disclosures concerning those transactions, as set out above. Goldman Sachs acted in such manner with the knowledge that by engaging in sham transactions with Fannie Mae officers, such officers were breaching fiduciary duties owed by them to Fannie and its shareholders.

70. As a result of these wrongful actions, defendant Goldman Sachs aided and abetted the breaches of fiduciary and other duties by the officer and director defendants as well as their colleagues.

71. As a result of defendant Goldman Sachs' aiding and abetting the breaches of fiduciary and other duties by the officer and director defendants, Fannie Mae has been and continues to be substantially damaged.

72. Accordingly, plaintiff on behalf of Fannie Mae and its shareholders, seeks from defendant Goldman Sachs monetary damages, injunctive remedies, and other forms of equitable relief.

## COUNT III
### INDEMNIFICATION FROM OFFICER AND DIRECTOR DEFENDANTS

73. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

74. The officer and director defendants, as agents of Fannie Mae, breached their fiduciary and other duties to Fannie Mae and its shareholders, as set out above.

75. Fannie Mae has suffered and will suffer significant and substantial injury as a direct result of these breaches of the fiduciary and other duties owed to it. Part of that injury suffered by Fannie Mae as a result of this wrongdoing by the officer and director defendants may be liability to investors, OFHEO and others.

76. Accordingly, plaintiff, on behalf of Fannie Mae and its shareholders, seeks from the officer and director defendants complete and full indemnification to the extent Fannie

Mae is found liable for the wrongdoing of these defendants and those who acted wrongfully together with them.

### COUNT IV
### BREACH OF CONTRACT BY GOLDMAN SACHS

77.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

78.    Defendant Goldman Sachs, as the underwriter/dealer for the transactions establishing the REMIC Trusts, was contractually and professionally obligated to provide the Company these services consistent with GAAP, with legal and regulatory requirements mandating truthful, complete, and appropriate public disclosures concerning these transactions, and with the law generally.

79.    Defendant Goldman Sachs failed to provide to Fannie Mae the services it was paid for and contractually obligated to provide to the Company, as set out above and, further, failed to perform its contractual obligations to Fannie Mae fairly and in good faith. Goldman Sachs not only kept the compensation that it received directly and indirectly as a result of its wrongdoing but invested the proceeds thereof and received additional unjust enrichment.

80.    As a result of these breaches of contract, as well as its unjust enrichment in connection therewith, Fannie Mae was substantially damaged in an amount presently unknown.

81.    Accordingly, plaintiff on behalf of Fannie Mae and its shareholders, seeks from defendant Goldman Sachs monetary damages.

## COUNT V
### NEGLIGENCE OF OFFICERS AND DIRECTORS

82.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

83.    Each officer and director defendant was negligent in the performance of his or her responsibilities for the management and governance of Fannie Mae, as a result of which the Company was substantially damaged in an amount presently unknown.

84.    Accordingly, plaintiff, on behalf of Fannie Mae and its shareholders, seeks from the officer and director defendants monetary damages.

## COUNT VI
### VIOLATIONS OF SARBANES-OXLEY BY RAINES AND HOWARD

85.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

86.    Defendants Raines and Howard, as Chief Executive Officer and Chief Financial Officer, respectively, signed off on the financial statements of Fannie Mae and, as such, were personally responsible for the accuracy thereof.

87.    Such financial statements materially overstated the assets, earnings, and net worth of Fannie Mae, and defendants Raines and Howard engaged in misconduct when they approved them.

88.    Pursuant to Section 304 of Sarbanes-Oxley, defendants Raines and Howard should be required to surrender to the Company all compensation or other benefits paid or arguably payable by Fannie Mae that were based upon or otherwise tied to its financial statements that were materially false.

## COUNT VII
### UNJUST ENRICHMENT OF OFFICER AND DIRECTOR DEFENDANTS

89.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

90.     Each officer and director defendant was unjustly enriched by the payments made to them as compensation and otherwise by the Company.

91.     Defendant Raines, from 1998 through 2004, while engaged in the wrongdoing set out above, received $22.6 million in salary and bonuses from Fannie Mae, plus $62 million in options and stock awards, and, in 2004, $200,000 for his use of corporate aircraft.

92.     Defendant Howard similarly received $7.7 million in salary and bonuses and $21.8 million in options and stock awards from Fannie Mae in those years.

93.     Other officer and director defendants also received millions of dollars in bonuses and "incentive" payments that were unearned and based upon the artificially inflated earnings caused and/or acquiesced in by the individual defendants.

94.     Throughout the relevant period, each of the director defendants was paid substantial fees for attending meetings and otherwise occupying positions as directors of Fannie Mae.  All of such payments and fees were unearned and unjustified since these directors so utterly failed to fulfill their responsibilities for the management and governance of the Company.  Each of such officers and directors not only received but retained the funds unjustly received and invested such funds, thereby receiving additional unjust enrichment.

95.     As a result of the foregoing unjust enrichment, each of the officer and director defendants should be required to repay to Fannie Mae the respective amounts paid plus

interest based upon each of these defendants' investment and retention of the proceeds of their unjust enrichment.

### PRAYER FOR RELIEF

Wherefore, plaintiff prays that the Court enter judgment against the defendants:

A.  declaring that the officer and director defendants have breached their fiduciary and other duties owed to Fannie Mae and its shareholders as alleged herein and further declaring that Goldman Sachs aided and abetted such conduct;

B.  awarding money damages against all defendants, jointly and severally, for all losses and damages sustained by Fannie Mae and its shareholders as a result of the acts, omissions and transactions complained of herein;

C.  directing all defendants, jointly and severally, to account for all losses and damages sustained by Fannie Mae caused by reason of the acts and omissions complained of herein;

D.  directing all defendants to remit to Fannie Mae all profits and other benefits and unjust enrichment they have obtained and retained as a result of the acts and omissions complained of herein, including all salaries, bonuses, fees, stock awards, options, compensation and common stock sales proceeds together with the earnings upon such amounts by which the defendants were unjustly enriched and imposing a constructive trust thereon;

E.  ordering that defendants and those under their supervision and control refrain from further violations as are alleged herein and to implement corrective measures that will rectify all such wrongs as have been committed and prevent their recurrence;

F.  ordering the Company to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with Sarbanes-Oxley, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the Company's by-laws or articles of incorporation and taking such other actions as may be necessary to place before shareholders for approval adoption of the following corporate governance policies:

1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.  appropriately test and strengthen internal audit and control functions;

3.  rotate independent auditing firms every five years;

4.  control and limit insider stock selling;

5.  reform executive compensation;

6.  add at least three independent directors with no previous or existing relationships with Fannie Mae, its present or former officers or directors, its independent auditor or with OFHEO;

G.  awarding pre-judgment and post-judgment interest as allowed by law;

H.  awarding punitive damages;

I.  awarding disgorgement as provided by § 304 of Sarbanes-Oxley;

J.  awarding plaintiff's attorneys' fees, expert fees, consultant fees and other costs and expenses; and

K.  granting such other and further relief as the Court may deem just and proper/

33

**JURY TRIAL DEMANDED**

Plaintiff demands a jury trial.

**CUNEO GILBERT & LaDUCA, LLP**

BY:  /s/ David W. Stanley
JONATHAN W. CUNEO (D.C. Bar# 939389)
ROBERT J. CYNKAR (D.C. Bar# 947845)
DAVID W. STANLEY (D.C. Bar# 174318)
507 C Street, N.E.
Washington, DC 20002
202-789-3960

**GREENFIELD & GOODMAN, LLC**

RICHARD D. GREENFIELD
MARGUERITE R. GOODMAN
780 Third Avenue 49th Floor
New York, NY 10017
(410)320-5931

**ANN MILLER, LLC**

ANN MILLER
834 Chestnut Street, Suite 206
Philadelphia, PA 19107
215-238-0468

Attorneys for Plaintiff

## **VERIFICATION**

I, JAMES KELLMER, hereby declare and verify as follows:

I am the plaintiff in the above-captioned case. I have read the contents of the foregoing Amended Complaint. I am informed and believe the matters related therein are true, based upon facts as related to me by my counsel, and on that ground I allege that the matters stated therein are true.

JAMES KELLMER

Dated: 11/19/07